GEORGE HUNT, Att'y Gen., etc.,

v.

THE CHICAGO AND DUMMY RAILWAY CO.

**1.** ATTORNEY GENERAL—COMMON LAW POWERS.—The court is of opinion that there is nothing in our present constitution or statutes which necessitates a construction which would exclude the attorney general from the exercise of common law powers in addition to those conferred by the statute. As it was a part of the attorney general's common law duty to

institute proceedings by information in chancery to restrain and abate public nuisances and purprestures, this information in chancery, to restrain a horse and dummy railway company from constructing or operating a railway upon certain streets of Chicago, was properly filed by the attorney general.

2. REPUGNANT STATUTES—REPEAL.—If two statutes are clearly repugnant to each other, the last enacted operates as a repeal of the former; and a subsequent statute revising the whole subject of the former one and intended as a substitute for it, although it contains no express words to that effect, operates as a repeal of such former statute.

3. HORSE AND DUMMY RAILROADS—PETITION OF ADJOINING PROPERTY OWNERS.—The provisions of subdivision 90, section 1, article 5, of the act to provide for the incorporation of cities and villages, so far as they apply to horse and dummy railroads incorporated under the general law, are repealed by the act of 1874 in relation to horse and dummy railroads, and as, under that act, no petition of the adjoining property owners is necessary, the information in this case presented no ground for equitable relief.

ERROR to the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding. Opinion filed November 8, 1886.

Mr. C. BECKWITH, for plaintiff in error; that the "act in regard to horse and dummy railroads" approved March 19, 1874, did not operate as a repeal of the city charter, cited Starr & Curtis' Stat., 472.

The bill was properly filed by the attorney general: R. S. Ch. 14, § 4.

Mr. FRANCIS ADAMS, for defendant in error; that the attorney general is not legally authorized to file the bill, cited § 1, Art. 5, of the Constitution of Ill.; Commonwealth v. Erie & N. E. R. R. Co., 27 Penn. St. 351; City of Quincy v. Jones, 76 Ill. 231; Field v. People, 2 Scam. 79.

The act of 1874 in relation to horse and dummy railroads is a separate and independent act, complete in itself, and intended as a substitute for all previous legislation in regard to its subject-matter.

A subsequent statute reversing the whole subject of a former one and intended as a substitute for it, although it contains no express words to that effect, operates as a repeal of

the former: I & M. Canal v. Chicago, 14 Ill. 334; Culver v. Third Nat. Bk. 64 Ill. 528; Andrews v. People, 75 Ill. 605; Devine v. Com'rs, 84 Ill. 590; Dingman v. People, 51 Ill. 277; Bartlett v. King, 12 Mass. 537.

BAILEY, J. This was an information in chancery, filed by George Hunt, Attorney General of the State of Illinois, on the relation of John McConnell, George McConnell and Benjamin F. McConnell, to restrain said company from constructing or operating a railway upon certain streets of the city of Chicago. The information represents that said company claims to be a corporation organized under the general laws of the State, with authority to construct, maintain and operate a railway in the county of Cook; that it also claims that an ordinance was passed by the city council of the city of Chicago, April 21, 1884, authorizing and licensing it to lay down, operate and maintain a double track railway, with all necessary and convenient turn-outs, turn-tables, side-tracks and switches in, upon over and along certain streets of said city, to wit, that portion of Adams street, including the bridge across the Chicago river, lying between Clark street and a point five hundred feet west of Desplaines street, and also certain portions of various other streets, particularly described; that said company, claiming that it has a valid license under and by virtue of said ordinance, entered upon Adams street between Fifth avenue and Franklin street on Sunday, the 26th day of April, 1885, and has excavated portions of said street and laid track, ties and rails for the purpose of constructing a railway in said street; that said railway constitutes an obstruction, to a greater or less extent, of the travel in said streets; that said company proposes to occupy the whole of Adams street between Clark street and Desplaines street in like manner, and also to construct railway tracks in the other streets mentioned in said ordinance, and to lay rails across the bridge on Adams street over the Chicago river; that the city of Chicago is organized under the general law of 1872, entitled "An act to provide for the incorporation of cities and villages," having become so organized in the month of May, 1875; that

Hunt v. Chicago and Dummy Ry. Co.

a petition of the owners of the land representing more than one half of the frontage of so much of Adams street as was sought to be used for said railway was not made or presented to the city council before a vote was taken on the passage of said ordinance, and that the city council therefore had no power to pass the same, and that said ordinance is null and void; that the relators are residents and taxpayers of the county of Cook, and are owners of a certain lot of land with the buildings thereon, situated on the corner of Adams street and Fifth avenue, which has a frontage of 114 feet on Adams street and abuts thereon; that the construction of said tracks on Adams street in front of said property interferes with the ingress, egress and access to said property by the owners thereof, and damages their said property, and that said company has not paid any damages to owners of property abutting upon said streets or any of them, and that he, said attorney general, has been requested by said property owners and tax payers to file this information. By way of supplement to said information it is alleged that, on the 4th day of May, 1885, said city council passed an ordinance purporting to authorize said company to lay down and operate a double-track railway upon that portion of Adams street lying between Clark street and Michigan avenue, upon certain terms and conditions therein mentioned, and that said company now claims the rights, privileges and franchises therein mentioned, to lay down, maintain and operate a railway in the street mentioned in said ordinance; that no petition of the property owners abutting upon that portion of Adams street mentioned in said ordinance was made or presented to the city council for the passage of such ordinance, and it is therefore insisted that said ordinance is null and void for want of such petition and of power in said council to pass it. The information prays for a decree perpetually enjoining and restraining said company from constructing or operating any railway under and by virtue of either of said ordinances, and for such other and further relief as may be equitable and just. To this information said company interposed a demurrer, which was sustained by the court, and said information was thereupon dis-

missed for want of equity, and the attorney general brings the record to this court by writ of error.

One of the points raised on demurrer, and now presented for our consideration, is, whether the attorney general is authorized by law to prosecute this information. The counsel for the defendant in error, in maintaining the negative of this question, urges that the office of attorney general, as it exists in this State, is a mere creature of the constitution, and that all the powers and duties pertaining to the office are those expressly conferred by that instrument and the statutes passed in pursuance thereof. On the other hand it is contended that the attorney general is an officer known to the common law, and exercising and performing various common law powers and duties beyond those expressly prescribed by statute, among which is the power to prosecute informations and bills in chancery on behalf of the State to prevent or abate purprestures and public nuisances.

The constitution of 1870 divides the powers of the State government into three distinct departments, and among the officers which it declares shall constitute the executive department, the attorney general is included; and it provides that the several officers constituting that department " shall perform such duties as may be prescribed by law." Since the adoption of the constitution the general assembly has passed the " Act in regard to Attorney Generals and States' Attorneys," in which, after prescribing various specific duties for the attorney general, it is provided that he shall " attend to and perform any other duty which may, from time to time, be required of him by law." In addition to this, various other statutes have been passed in relation to different subjects, in which other specific duties have been imposed upon the attorney general, but among these various specifications none can be found, we think, which can be held to include the duty or power to institute and prosecute a suit of the nature of the one now under consideration. Indeed, we do not understand the counsel for the attorney general as attempting to derive such power from any express statutory grant. Can it then be derived from the common law? Or the question may

be put in the broader form, is the attorney general vested with any common law powers not specifically conferred by statute ?

In England the office of attorney general has existed from a very early period, and has been vested by the common law with a great variety of duties in the administration of government. The attorney general was the law officer of the crown, and its only legal representative in the courts. Rex v. Austen, 9 Price, 142; Attorney General v. Brown, 1 Swanst. 294; Rex v. Wilkes, 4 Burr. 2570. It might be difficult to enumerate all the powers vested in the attorney general at common law, but it is sufficient for our present purpose to say that it was unquestionably a part of his common law duty to institute proceedings by information in chancery to restrain and abate public nuisances and purprestures. People v. Vanderbilt, 26 N. Y. 287; People v. Miner, 2 Lans. 396; Attorney General v. Richards, 3 Anstruther, 753; 2 Story's Eq. Juris., §§ 922, 923; Wood on Nuisances, § 78, and cases cited. Upon the organization of governments in this country, most if not all of the commonwealths which derive their system of jurisprudence from England adopted the office of attorney general as it existed in England, as a part of the machinery of their respective governments. The prerogatives which pertain to the crown in England are here vested in the people, and the necessity for the existence of a public officer charged with the protection of public rights and the enforcement of public duties by proper proceedings in the courts of justice, is just as imperative here as there. The duties of such an office are so numerous and varied that it has not been the policy of the legislature to attempt the difficult task of enumerating them exhaustively, but they have ordinarily been content, after expressly defining such as they have deemed the most important, to leave the residue as they exist at common law, so far as applicable to our jurisprudence and system of government.

In case of each of the successive territorial governments of the territories of which Illinois formed a part before its admission into the Union as a State, the office of attorney gen-

eral existed, and our investigations, so far as we have been able to carry them, bring us to the conclusion that it was a common law office, having powers and duties analogous to those of the attorney general in England, so far as applicable, with the addition of such duties as were imposed by territorial legislation. The constitution of 1818 recognized the existence of the office, by disqualifying the person holding it from becoming a member of the general assembly, but made no provision as to the nature of his duties or the mode of his appointment. The office, however, was continued by the general assembly substantially as it had previously existed, the election being made by that body, until the adoption of the constitution of 1848. That constitution recognized the existence of the office in the same manner as the constitution of 1818, but as it prohibited the election or appointment of any officer by the general assembly, the office ceased to exist until the passage of the act of February 27, 1867, creating the office of attorney general, and prescribing his duties, that act being, so far as it relates to the powers and duties of the office, substantially identical with our present statute.

There is nothing in our present constitution or statutes which necessitates, in our opinion, a construction which would exclude the attorney general from the exercise of common law powers in addition to those conferred by the statute. The constitution authorizes him to perform such duties as may be *prescribed* by law. It is said that the word *"prescribed"* can properly be held to refer only to the statutory law—the *lex scripta*. This, plainly, is too narrow an interpretation of the word. It will be remembered that Blackstone defines municipal law to be, "a rule of civil action *prescribed* by the supreme power of the State, commanding what is right and prohibiting what is wrong," and that the learned author thereupon proceeds to divide the law as thus defined into the *lex scripta* and the *lex non scripta*. Among the definitions of the word "prescribe" given by Webster, are these: "To give law; to direct; to dictate; to give as a guide, direction or rule of action;" either of which is quite as applicable to the unwritten as to the written law. We see, then, no difficulty in interpreting the con-

stitutional provision that the attorney general shall perform such duties as may be prescribed by law, as meaning that he shall perform such duties as shall be prescribed by any law, statutory or otherwise, by which the duties of the attorney general, as that officer is known to our jurisprudence, are imposed and defined.

This view is further supported by the provisions of the statute in relation to the duties of the attorney general. That, as has already been stated, provides that, in addition to certain duties therein specified, he shall attend to and perform any other duties which may from time to time be required of him by law. The common law of England, having been expressly adopted in this State, is as much a part of our law, whenever it is applicable, and so far as it has not been changed by statute, as are the statutes themselves; and a duty required of the attorney general by the rules of the common law is as much a duty "required of him by law" as though it were imposed by the express mandate of a statute.

In other States it has been frequently held that where the duties of the attorney general are prescribed by statute there are still common law powers incident to the office which are not derived from the statute. It is so held in Parker v. May, 5 Cush. 336, in relation to the power to institute a proceeding for the enforcement of a public charity. In People v. Miner, 2 Lansing, 396, it was held that the attorney general has the powers belonging to that office at common law, and such additional powers as the legislature has conferred upon him, and that by virtue of his common law powers he was authorized to interfere to restrain corporate action, where the act complained of would produce a public nuisance or tend to a breach of a trust for charitable uses. So in the case of the People v. Tweed, 13 Abb. Prac. R. N. S. 25, the authority of the attorney general to maintain an action to recover moneys unlawfully raised by public officers of a municipal corporation and converted to their own use, is sustained on the same principle. See also, People v. Vanderbilt, 26 N. Y. 287; Attorney General v. Moltier, 26 Mich. 444; Attorney General v. City of Detroit, Id. 262.

The same view seems to us to have been taken by our own Supreme Court, so far as that tribunal has had occasion to intimate an opinion upon the subject. Thus, in Newberry v. Blatchford, 106 Ill. 584, which was a suit in chancery to obtain a construction of a will, by which the testator gave one half of his estate to found and endow a public charity, and directed the distribution of the residue among his heirs at law, the power and duty of the attorney general to interpose to prevent the misappropriation of a fund held in trust for a public charity is clearly recognized. The court say: "The doctrine, no doubt, is, that in all. bills asking the advice or direction of a court of equity as to the administration of a public charity, and especially where waste or mismanagement is apprehended, or where the decree would affect the interests of the *cestui que trust*, the attorney general or other public officer whose duty it may be to have a care of such matters, is a proper party, either as complainant or defendant, and courts not unfrequently hesitate to decree concerning a public charity unless the general law officer representing the donees is a party in some way. * * * Had it appeared that the trustees were misappropriating the trust fund, it would no doubt have been the duty of the attorney general to interpose for its preservation. It is only where the parties having charge of the fund unite in an abuse of their trust, and there is no one having a right to sue in his own name concerning it, as is the case with regard to a public charity, that the suit must, *ex necessitate rei*, be instituted by the attorney general."

It must be admitted that there is no statute imposing upon the attorney general the duty of instituting or becoming a party to any legal proceedings for the protection or preservation of funds held in trust for a public charity. Whence, then, arises such duty? Manifestly from the principles of the common law, which make the attorney general the proper representative of the people of the State in all courts of justice, and charge him with the official duty of interposing for the protection and preservation of the rights of the public whenever those rights are invaded, and there is no other adequate or available means of redress.

The case of Attorney General v. C. & E. R. R. Co., 112 Ill. 520, was an information in the nature of a *quo warranto*, brought by the attorney general to require the defendant to show by what warrant it claimed to exercise the right, privilege and franchise, among other things, of constructing and operating its railroad across the north branch of the Chicago river and over certain streets and alleys of the city of Chicago. The defendant set up in its answer, that the attorney general, on behalf of the people, had previously filed an information in chancery against said defendant and another railroad company to restrain the defendant from constructing its said railroad, the same issues being made in that suit as in the *quo warranto* suit, and that upon the trial of said chancery suit, upon pleadings and proofs, a final decree was entered in favor of the defendant, holding that said defendant had legal authority, under its charter and the ordinances of the city of Chicago, to construct and operate its said railroad across the north branch of the Chicago river and over said streets and alleys. It was held that the court had jurisdiction of the subject-matter, and the parties in the chancery suit, and that the decree in that case was conclusive of the rights of the parties in the *quo warranto* proceeding. It is clear that this conclusion could only have been reached upon the theory that the attorney general had authority to institute the chancery suit, an authority which is not given by statute, and which must therefore be derived from the principles of the common law. It may be observed that the chancery suit which is thus sustained by the Supreme Court is precisely analogous in principle with the suit at bar, and the authority of the attorney general to bring that suit, necessarily involves the authority to bring this. We are of the opinion, then, that the institution of the present suit was clearly within the legal authority of the attorney general.

But one question is raised by the information which it is necessary for us to consider, viz., whether the city council of the city of Chicago had the power to grant to the defendant the right to lay down its railroad tracks in the streets mentioned in the information, in the absence of a petition of the

owners of the land representing more than one half of the
frontage of so much of said streets as is sought to be used for
railroad purposes.    The information represents that no such
petition was presented to the city council prior to the passage
of the ordinances licensing the defendant to lay down its rail-
road tracks in said streets, and such averment being admitted
by the demurrer, must be taken as true.

The twenty-fourth subdivision of section 1, article 5, of
the "act to provide for the incorporation of cities and vil-
lages," in force July 1, 1872, under which the city of Chicago
is organized, gives power to the city council, "to permit, regu-
late or prohibit the locating, constructing or laying a track of
any horse railroad in any street, alley or public place; but
such permission shall not be for a longer term than twenty
years."    The ninetieth subdivision of the same section is as
follows : "The city council or board of trustees shall have no
power to grant the use of, or the right to lay down, any rail-
road tracks in any street of the city, to any steam or horse
railroad company, except upon a petition of the owners of the
land representing more than one half of the frontage of the
street or so much thereof as is sought to be used for railroad
purposes."

The "act concerning corporations," in force July 1, 1872,
provides, among other things, for the incorporation of "horse
and dummy railroads," and section twenty-eight of said act
is as follows : "Nothing in this act shall be construed to allow
the construction or operation of any street railroad in any city,
town or incorporated village, without the consent of the local
authorities thereof."    This latter section follows and in sub-
stance re-enacts section 4, article 11, of the constitution.    Thus
stood the law prescribing the terms and conditions upon which
the city council of the city of Chicago had the power to grant
the use of the streets of the city for railroad purposes, until
the passage of the "act in regard to horse and dummy rail-
roads," in force July 1, 1874.    The first section of that act is
as follows :

"Any company which has been, or shall be incorporated
under the general laws of this State, for the purpose of con-

structing, maintaining or operating any horse or dummy railroad or tramway, may enter upon and appropriate any property necessary for the construction, maintenance and operation of its road, and all necessary siding, side-tracks and appurtenances, and may, *subject to the provisions contained in this act,* locate and construct its road upon or over any street, alley, road or highway, or across or over any waters of this State, in such manner as to not unnecessarily obstruct the public use of such street, alley, road or highway, or interrupt the navigation of such waters."

Section 2 of said act provides for the mode of making compensation for private property taken or damaged, and section 3 is as follows:

"No such company shall have the right to locate or construct its road upon or along any street or alley, or over any public ground in any incorporated city, town or village, without the consent of the corporate authorities of such city, town or village, nor upon or along any road or highway or upon any public ground without any incorporated city, town or village, except upon the consent of the county board. Such consent may be granted for any period, not longer than twenty years, *on petition of the company,* upon such terms and conditions, not inconsistent with the provisions of this act, as such corporate authorities or county board, as the case may be, shall deem for the best interests of the public; provided no such consent shall be granted, unless at least ten days public notice of the time and place of presenting such petition shall have been first given by publication in some newspaper published in the city or county where such road is to be constructed, and except upon the condition that the company will pay all damages to owners of property abutting upon the street, alley, road or highway or public ground upon or over which such road is to be constructed, which they may sustain by reason of the location or construction of the road; the same to be ascertained and paid in the manner provided by law for the exercise of the right of eminent domain."

The question is, whether the provisions of subdivision

90, section 1, article 5, of the act to provide for the incorporation of cities and villages, so far as they apply to horse and dummy railroads incorporated under the general law, is not repealed by the act in relation to horse and dummy railroads. While the repeal of statutes by implication is not favored, still, it is a familiar principle that, if two statutes are clearly repugnant to each other, the last enacted operates as a repeal of the former; and also, that a subsequent statute revising the whole subject of the former one, and intended as a substitute for it, although it contains no express words to that effect, operates as a repeal of such former statute. Culver v. Third National Bank, 64 Ill. 528; People v. Jealmc, 7 Eastern Reporter, 290. We are of the opinion that the latter of the two principles here stated, at least, applies to the statutes under consideration.

It seems to have been the intention of the legislature, in passing the horse and dummy railroad act, to provide a complete code governing the location and construction of these two species of railroads, both within and outside the corporate limits of cities and villages, and to fix the terms and conditions upon which such railroads may be permitted to occupy the streets, alleys and public grounds within such municipal corporations, and the roads and highways beyond their boundaries. Up to that time one rule had prevailed in case of cities and villages organized under the general law, and other rules different from that and different from each other in case of cities and towns organized under special charters, and a still different rule in case of roads and highways outside of incorporated cities, towns and villages. In passing said act, the legislature furnished a complete, simple and uniform code for the location and construction of such railroads. Whatever may have been the conditions imposed by previous legislation, the first section of this act declares that horse and dummy railroad companies organized under the general incorporation law, may, subject to the provisions contained in said act, locate and construct their roads upon or over any street, alley, road or highway. The obvious meaning of this provision is, that the only limitations upon the right of such companies to locate

and construct their roads upon or over any street, alley, road or highway, shall be those provided by the act itself.

The third section of the act requires the consent of the proper municipal authorities to the use of any street or alley for railroad purposes, and provides the mode of obtaining such consent and the conditions upon which it may be granted. Such consent may be granted on petition of the company, on such terms and conditions as the authorities granting it shall deem for the best interests of the public. The proviso prohibits such consent unless ten days public notice of the time and place of presenting the petition shall have been given by publication in some newspaper in the city or county, and requires that the consent shall be upon the condition that the company will pay all damages to the owners of property abutting on the street. These provisions, at least so far as they relate to the mode of obtaining the consent of the municipal authorities to the use of streets, alleys, etc., for railroad purposes, seem to us to be full and complete, and it is manifest, we think, that they were intended by the legislature as a complete revision of the statutes applicable to that subject.

There is also a clear repugnance between subdivision 90, section 1, article 5, of the act to provide for the incorporation of cities and villages, and the horse and dummy railroad act. The former act, in effect, prohibits the use of a street for railroad purposes without a petition of the owners of more than one half of the land abutting on the street, while the latter act provides that such use *may, subject to the provisions of said act,* be made of any street, the act containing no provision requiring any petition of the owners of the property abutting on the street. The former act provides that the consent of the municipal authorities to the use of the street for railroad purposes shall not be given except upon such petition of the majority of the abutting property owners, while the latter act provides that it may be granted *upon petition of the railroad company.* The latter act in no way contemplates the presentation to the city council of any petition of the abutting owners, but does contemplate and provide

for the presentation by the company of its petition, and of public notice of the time and place of such presentation. The modes of procedure contemplated by the two acts seem to be essentially different, and the safeguards which they throw around the rights of adjoining property owners are also different. The former act required the petition of the majority of the property owners in advance before consent could be given, but it required no publicity and afforded no opportunity for the minority to appear and be heard before the city council, however unfavorably their rights might be affected. The latter act, in addition to vesting the city council with the broadest discretion to impose any terms and conditions which, in their opinion, will best subserve the public interests, requires public notice of the time and place at which the action of the municipal authorities is to be invoked, so that all property owners and others interested may be present, if they see fit, with their reasons and remonstrances against the granting of the company's petition. Which of these modes of procedure is best calculated to subserve and protect the rights and interests of property holders and the public, was a matter for legislative consideration. The general assembly, in the latest expression of the legislative will, has pronounced in favor of the latter, a. the courts can only give efficacy to the will which it has ti s expressed.

Being of the opinion that, under the present statute, no petition of the adjoining property owners was necessary, it follows that the information presented no ground for equitable relief, and that the demurrer was properly sustained. The decree will be affirmed.

Decree affirmed.