THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.*
LONG ISLAND RAILROAD and STATEN ISLAND RAPID
TRANSIT RAILROAD, Defendants.

(Supreme Court, Kings Special Term, December, 1920.)

Injunctions — when motion for an injunction pendente lite re-
straining defendants from increasing their rates granted —
railroads — carriers — pleading — jurisdiction — interstate
commerce commission — public service commission — Inter-
state Commerce Act — Transportation Act of 1920.

The object of an injunction *pendente lite* is to prevent irre-
parable injury pending the final ascertainment of plaintiff's
right, but not to determine the right itself.   (P. 703.)

Where from the papers submitted upon a motion for an
injunction *pendente lite,* including sufficient allegations of the
complaint, it appears that there is reason for believing that
plaintiff will be successful in the suit upon equitable grounds,
the court, in its discretion, may grant the injunction in order
to maintain the *status quo* until it can be determined whether,
upon ascertained facts, plaintiff is entitled to the relief sought.
(Pp. 702, 703.)

Under and by virtue of an order of the interstate commerce
commission increasing passenger and excess baggage rates,
claimed to have been made pursuant to the Transportation Act
of 1920, which amended section 13 of the Interstate Commerce
Act, and provided for the return to their owners of the rail-
roads of which the federal government had taken possession
and operated since December 23, 1917, the defendants, intra-
state carriers, propose to put in force rates for the carriage
of passengers and excess baggage, higher than the rates allowed
and approved by the laws of the state and the orders of the
public service commission having jurisdiction.   Upon granting
a motion for an injunction *pendente lite* in an action brought
by the attorney-general on behalf of the people of the state
to restrain defendants from so increasing their rates, and in
which said order of the interstate commerce commission was
pleaded both as a defense and as a ground for a denial of the
motion, *held:*

That the action was properly brought.

That neither directly nor through the interstate commerce commission has congress the power to fix intrastate rates on the lines of intrastate carriers; nor does the Interstate Commerce Act, as amended by the Transportation Act of 1920, empower the interstate commerce commission to fix such rates. (Pp. 724–728.)

Even assuming that congress has lawfully authorized the interstate commerce commission to fix intrastate rates on intrastate railroads to prevent discrimination, yet where, as here, no facts appear which show undue discrimination against interstate commerce or between individuals or localities in interstate commerce on the one hand and intrastate commerce on the other, the interstate commerce commission, in making the order relied upon by the defendants, exceeded its authority, as facts did not exist which, under the Interstate Commerce Act, as amended, justified the exercise of such power. (P. 723.)

MOTION for injunction *pendente lite.*

Charles D. Newton, Attorney-General, by Edward G. Griffin, Deputy Attorney-General, for plaintiff.

John P. O'Brien, Corporation Counsel, by Vincent Victory, Assistant Corporation Counsel, for City of New York, intervening.

Terence Farley and John A. Mullen, for Public Service Commission of the State of New York, First District, intervening.

John Holley Clark, Jr., for Queensboro Chamber of Commerce, intervening.

Joseph F. Keany (Alfred A. Gardner, of counsel), for defendant Long Island Railroad Company.

Cravath, Henderson, Leffingwell & de Gersdorff (R. I. Milson, of counsel), for defendant Staten Island Rapid Transit Railway Company.

BENEDICT, J.   This is an application for the granting of a temporary injunction restraining the defend-

*Supreme Court, December, 1920.*     [Vol. 113.·

ants from increasing the rates of fare charged by them for the carriage of passengers, excess baggage and a certain class of freight. It comes here upon an order to show cause issued on the application of the attorney-general on behalf of the people of this state.

The ground for the relief asked is that the defendants propose to put in force rates higher than those allowed and approved by the laws of the state and the orders of the public service commission. The defendants set up an order of the interstate commerce commission as a defense and a ground for denying the relief asked.

The briefs and motion papers in this cause were submitted to the court on December eleventh, and, as the matter is of some importance to the public, as well as to the litigants, I have deemed that a prompt statement of my reasons for the conclusions which I have reached may not be without interest to them. I do not indulge myself in any illusions that certain views which will be expressed in this memorandum will have any weight in the ultimate determination of this litigation. I am compelled, however, to call attention to them because they seem of late to be forgotten or overlooked too frequently by law makers, and at times also by high judicial tribunals. Before taking up the matters referred to, I wish to speak of two objections which are made by the respondents and upon which they oppose this application.

*First.* The respondents urge that, unless the right be clear and certain, the injunction should not issue. While this is always true in respect of permanent injunctions, the rule is not the same in regard to interlocutory relief. It is an established rule of equity jurisprudence that when an application is made to the court for an injunction, *pendente lite,* if there appears to the court reason for believing from the papers sub-

mitted, including sufficient averments in the complaint, that the plaintiff will be successful in the suit upon grounds which are cognizable in a court of equity, that court may, in its discretion, use the power of injunction to maintain the *status quo* until it can be determined, after a complete hearing of the cause, whether the plaintiff is, upon the facts to be ascertained, entitled to the relief sought, since, otherwise, the plaintiff, although he should ultimately prevail, might lose, pending the suit, rights or property to which he was found to be entitled but which could not later be restored by the decree. In other words, the object of a preliminary or interlocutory injunction is to prevent irreparable injury pending the final ascertainment of the right, but not to determine the right itself.

*Secondly.* The respondents urge, further, that this action is improperly begun by the attorney-general on behalf of the people. This suggestion may be said to embrace two inquiries:

(a) Can the people of the state maintain such an action?

(b) Can it be instituted on their behalf by the attorney-general?

As to the first, I think it cannot be doubted that if the act of any person, artificial or natural, involves or may involve an unlawful invasion of the rights, privileges or immunities of all the inhabitants of the state, then the state, itself, may come into a court of equity for the purpose of preventing or restraining the wrong. I believe this to be true notwithstanding similar action may be taken by specific individuals, political subdivisions of the state, or boards of legislative creation claiming that special or peculiar injury will result to them if the unlawful acts be not prevented. The reason for this is plain. All power of government in the state is derived from the people them-

selves. They have, from time to time, established written constitutions. These constitutions, unlike the federal Constitution, are not grants of power, but, on the contrary, are limitations " of the powers, of the people themselves, self-imposed, by the constitutional compact. See *People ex rel. Wood* v. *Draper*, 15 N. Y. 528, a case which was applied in *Oregon R., etc., Co.* v. *Campbell*, 173 Fed. Repr. 957, 979, where it was held that a state was not precluded from regulating carriers and rates between points within the state. Judge Denio said in the text case, referring to the creation of police powers by an act claimed to be unconstitutional: " As a political society, the State has an interest in the repression of disorder, and the maintenance of peace and security in every locality in its limits."

So here, the same principle applies to the regulation of rates of fare affecting the interests of all the people of the state, in so far as the state has power to control and has undertaken to fix those rates. Similar principles not infrequently have been applied in our state jurisprudence, as, for example, the right of the people to the use of the foreshore upon navigable waters (*People* v. *Steeplechase Park Co.*, 218 N. Y. 459); the right of the people to the forest preserve (*People* v. *Adirondack Railway Co.*, 160 id. 225, 234); the right to secure the removal of a public officer (*People* v. *Ahearn*, 196 id. 221); the right to determine the amount of franchise tax to be paid by a corporation (*People* v. *Albany Insurance Co.*, 92 id. 458); the right to enforce an alleged forfeiture of a railroad company's charter (*People* v. *Albany & Vermont R. R. Co.*, 77 id. 232; also *People* v. *Atlantic Ave. R. R. Co.*, 125 id. 513); the right to determine whether a foreign corporation is " doing business within this state " (*People* v. *American Bell Telephone Co.*, 117 id. 241); the right to restrain the completion of a pier and to

compel the removal of so much as had been erected (*People* v. *New York & S. I. Ferry Co.*, 68 id. 71). In these and many other similar cases the courts have taken cognizance of the right of the people of the state, acting through their attorney-general, to sue directly to enforce rights belonging to all the people, as distinguished from that class of proceedings instituted by what are called " state writs " sued out by individuals to enforce private rights or by public officers in actions or special proceedings to which the people are a party. As to the second inquiry as to the right of the attorney-general to institute the proceeding, I think there is no doubt of his power in the premises.

The attorney-general of this state was, under the first and second Constitutions of the state, an appointed officer, as he had been during the colonial period. Under the third Constitution (1846) and subsequently, the attorney-general has been an elected state officer. The office of attorney-general is of ancient origin and has always existed in the colony and state of New York. In *People* v. *Kramer*, 33 Misc. Rep. 213, it was said by Recorder Goff: " It is unnecessary, with regard to the Attorney-General, to go back further than the organization of the State government in 1777. The office was then in existence as the Attorney-General of the colony, and was clothed with certain rights and powers derived from the common law. In *People* v. *Miner*, 2 Lans. 397, the court, by Mullen, J., said: ' The attorney-general had the power, and it was his duty, among other things, to prosecute all actions, necessary for the protection and defense of the property and revenues of the crown, and, by information, to bring certain classes of persons accused of crimes and misdemeanors to trial.' The common law of England was the law of our colonial government. The Attorney-General, under the

45

colonial government, received his appointment from the Governor of the colony, and exercised his duties under the common law. Later on, he was commissioned by the crown. The Attorney-General, at common law, was the chief legal representative of the sovereign in the courts, and it was his duty to appear for and prosecute in behalf of the crown any matters, criminal as well as civil. It was said by Blackstone (3 Black. Com. 27): ' He represents the sovereign, in whose name all criminal process issue, and his power to prosecute all criminal offenses is unquestioned at common law.' In *People* v. *Miner, supra,* it was said: ' As the powers of the attorney-general were not conferred by statute, a grant by statute of the same or other powers, would not operate to deprive him of those belonging to the office at common law, unless the statute, either expressly or by reasonable intendment, forbade the exercise of powers not thus expressly conferred. He must be held, therefore, to have all the powers belonging to the office at common law, and such additional powers as the legislature has seen fit to confer upon him.' This was cited with approval in *People* v. *Tweed,* 13 Abb. Pr. (N. S.) 25.''

By section 62 of the Executive Law, it is provided, in part, as follows:

'' § 62. General Duties. The attorney general shall:

'' 1. Prosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel, in order to protect the interests of the state.''

In England the attorney-general represents the crown for all forensic purposes and may even be sued in chancery as representing the crown when the relief sought is in the form of a declaratory judgment or

otherwise against the crown. *Dyson* v. *Attorney-General,* (1912) 1 Ch. 158. The prerogatives pertaining to the crown in England are in this state vested in the people, and the necessity for the existence of a public officer charged with the protection of public rights and the enforcement of public duties by proper proceedings in the courts of justice is just as imperative here as there. See *Hunt* v. *Chicago, etc., R. Co.,* 20 Ill. App. 282; revd., on other grounds, 121 Ill. 269; also *State* v. *Bryan,* 50 Fla. 293, 350. Indeed, I am not at all sure but that the rule asserted in *Monk* v. *Ouimet,* 19 L. C. J. 71, to the effect that the right of the attorney-general for the province of Quebec to appear for the crown cannot be questioned by a private person, does not apply by parity of reasoning to the present case.

Upon the foregoing considerations, I conclude that the present action is properly brought by the attorney-general in the name and for the benefit of the people of this state.

That a state may bring an injunction suit in the state courts to restrain carriers from charging intra-state rates in excess of those allowed by the state laws and state authorities, even though the defense be an order of the interstate commerce commission assuming to act pursuant to authority of congress, seems to be recognized in *American Express Company* v. *State of North Dakota ex rel. Caldwell,* 244 U. S. 617. And it is obvious that in such a case the burden of proof is on the defendants to show the legality of such excess rates under the paramount federal law.

This case arises by reason of the threatened action of the defendants in increasing rates in contravention of the laws of this state and the orders of the public service commission having jurisdiction. The defendants seek to justify their intended action under a certain order made by the interstate commerce commis-

sion claimed to have been made pursuant to authority conferred by the act of congress known as " Transportation Act 1920," which became a law February 29, 1920, and which provided for the return to their owners of the railroads of which the federal government had taken possession and which it had operated since December 28, 1917. It is well known that during the period of federal operation the fares for transportation of passengers on the railroads in New York state and elsewhere were fixed at the rate of three cents a mile, and rates were fixed for other purposes higher than the theretofore existing rates. The Transportation Act provided, among other things, as follows:

" Sec. 208. (a) All rates, fares, and charges, and all classifications, regulations, and practices, in any wise changing, affecting, or determining, any part or the aggregate of rates, fares, or charges, or the value of the service rendered, which on February 29, 1920, are in effect on the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect until thereafter changed by State or Federal authority, respectively, or pursuant to authority of law; but prior to September 1, 1920, no such rate, fare, or charge shall be reduced, and no such classification, regulation, or practice shall be changed in such manner as to reduce any such rate, fare, or charge, unless such reduction or change is approved by the Commission.

" (b) All divisions of joint rates, fares, or charges, which on February 29, 1920, are in effect between the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect until thereafter changed by mutual agreement between the interested carriers or by State or Federal authorities, respectively."

Section 416 of the Transportation Act of 1920 amended section 13 of the Interstate Commerce Act by adding the following paragraphs:

" (3) Whenever in any investigation under the provisions of this Act, or in any investigation instituted upon petition of the carrier concerned, which petition is hereby authorized to be filed, there shall be brought in issue any rate, fare, charge, classification, regulation, or practice, made or imposed by authority of any State, or initiated by the President during the period of Federal control, the Commission, before proceeding to hear and dispose of such issue, shall cause the State or States interested to be notified of the proceeding. The Commission may confer with the authorities of any State having regulatory jurisdiction over the class of persons and corporations subject to this Act with respect to the relationship between rate structures and practices of carriers subject to the jurisdiction of such State bodies and of the Commission; and to that end is authorized and empowered, under rules to be prescribed by it, and which may be modified from time to time, to hold joint hearings, with any such State regulating bodies on any matters wherein the Commission is empowered to act and where the rate-making authority of a State is or may be affected by the action taken by the Commission. The Commission is also authorized to avail itself of the cooperation, services, records, and facilities of such State authorities in the enforcement of any provision of this Act.

" (4) Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate

Supreme Court, December, 1920. [Vol. 113.

or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding.''

On July 29, 1920, the interstate commerce commission made an order which provided for increases, effective throughout the United States on all railroads subject to the jurisdiction of the interstate commerce commission, as follows:

1. Passenger fares, twenty per cent increase.

2. Excess baggage rates, twenty per cent increase.

3. Space in sleeping and parlor cars, surcharge of fifty per cent of charge for space, to go to the carriers.

4. Rates for transportation of milk and cream, twenty per cent increase.

Increases were also made in freight rates, but such rates are not in question in this action. All these increases were, of course, increases over the rates prevailing during the period of federal control and continued in effect by section 208 of the Transportation Act of 1920, above quoted.

Thereafter, but at just what date does not appear, the defendants in this action, together with other railroad corporations in this state, presented schedules to the New York state public service commission hav-

ing jurisdiction, proposing to increase intrastate rates as well as interstate rates to the extent specified by the interstate commerce commission, and requesting the public service commission having jurisdiction to authorize the increases. The public service commission approved the proposed changes in freight rates, but refused to approve the changes proposed by the Long Island Railroad Company in passenger fares, excess baggage charges, surcharge for space in parlor and sleeping cars, and rates for transportation of milk and cream, and those proposed by the Staten Island Rapid Transit Railway Company in passenger fares. The latter company does not transport milk or cream nor operate parlor or sleeping cars.

Thereupon the defendants, together with other New York carriers, made application to the interstate commerce commission for relief, as a result of which an order was made by the commission on November 13, 1920, which in effect ordered the defendants herein and other railroads in New York to increase intrastate rates for the four classes of service above mentioned, except commutation fares, to the same level as the interstate rates fixed by the interstate commerce commission. It is the validity of this order which is drawn into question in this action. The action of the public service commission in refusing to approve the proposed changes in intrastate rates, as above set forth, operated to make effective after September 1, 1920, the rates which had existed pursuant to its authority prior to the period of federal control. *Public Service Comm.* v. *N. Y. Central R. R. Co.,* 229 N. Y. 592.

The defendant Long Island Railroad Company is wholly an intrastate carrier. Its road is located entirely on Long Island in New York state, except for a line which runs to the Pennsylvania Terminal in the

borough of Manhattan, New York city. It is engaged in interstate commerce so far as the four classes of service above mentioned are concerned, only because it issues through tickets for travel over its lines and the lines of other carriers to points outside of the state, and transports passengers on through tickets issued at points outside of the state to points on its line, and transports baggage of passengers checked on such through tickets. It is alleged that about twenty per cent of its gross revenue is derived from interstate transportation of passengers and freight. But as freight rates are not in question here, they can be left out of consideration. Leaving out the freight business, there are facts alleged in the replying affidavits submitted by the public service commission to show that the interline passenger business of the Long Island railroad, which, of course, includes all its interstate passenger business, is very small as compared with the entire volume of its passenger traffic. Exact figures do not appear. The company could have furnished them but it has not done so. Considering the volume of its suburban commutation business, it seems probable that its interstate passenger business on through tickets is negligible.

The defendant Staten Island Rapid Transit Railway Company, so far as its passenger traffic is concerned, is a local rapid transit railroad, located entirely in the borough of Richmond (Staten Island), New York city. Its only pretension to be engaged in interstate passenger traffic is based upon the fact that it owns and operates a ferry from its terminal at Tottenville to Perth Amboy, on the New Jersey shore. This ferry is now run upon an independent time schedule, and not in conjunction with the trains of said defendant, although it is alleged that through tickets are sold. It is further made to appear in the replying affidavits of

the public service commission that the number of passengers using the railroad and ferry is very small compared with the total number of passengers carried by said defendant, and that no baggage is checked over the ferry, and no mail or express matter is carried thereon.

Three questions are presented by this action.

1. Has congress the power either directly or through the interstate commerce commission to fix intrastate rates on lines of intrastate carriers?

2. Did congress confer that authority upon the interstate commerce commission?

3. Assuming both the foregoing questions to be answered in the affirmative, did the facts presented to the interstate commerce commission give it jurisdiction to make the order under the act; or, in other words, is its action within the authority conferred on it by congress?

The motion presents the question whether there is sufficient ground to believe that congress did not have such power, or that it did not confer such authority upon the commission, or that facts do not exist to justify the exercise of such authority if the commission possesses it, to warrant this court in granting an injunction *pendente lite* to restrain the defendants from putting into effect the proposed increases in rates until these questions can be determined after a full examination upon the trial.

Preliminary to any discussion of these questions, it is necessary to set forth briefly just how far the United States Supreme Court has gone in sustaining the exercise of federal power over intrastate rates of transportation. It is not necessary to go back of the *Minnesota Rate Cases*, 230 U. S. 352, for the opinion in those cases contains a review of the authorities up to that time. In that case it appeared that the intrastate

rates charged between points in Minnesota by certain interstate carriers, pursuant to directions of the railway and warehouse commission of that state, were discriminatory in favor of certain cities situated near the border line, as against cities situated in adjoining states. Yet it was held that the fixing of such rates by the state authorities did not of itself constitute a burden upon interstate commerce, and was not unconstitutional as an interference with interstate commerce in the absence of any act of congress pertaining to the subject, and that the Interstate Commerce Act of 1887, as amended, did not, in the absence of a finding by the interstate commerce commission that the state rates were unjustly discriminatory, operate to take away or restrict the state power to fix rates for intrastate traffic, because it contained a proviso that it should not apply " to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property wholly within one State and not shipped to or from a foreign country from or to any State or Territory as aforesaid." The Minnesota rates were, however, held confiscatory and therefore unconstitutional.

The next important case was *Houston & Texas Railway* v. *United States,* 234 U. S. 342, the so-called Shreveport case. In that case it appeared that certain interstate carriers whose railroads ran between Shreveport, Louisiana, and Dallas and Houston, Texas, charged rates for intrastate transportation in Texas, fixed by the local authorities in that state, proportionately less than the interstate rates from Shreveport to points in Texas, which latter rates had been approved as reasonable and authorized by the interstate commerce commission; that there was territory in Texas which was competitive territory as between Shreveport on the one hand and Houston and Dallas on the other, and

that this difference between interstate and intrastate rates constituted a prejudicial discrimination against Shreveport and in favor of Houston and Dallas and that the interstate commerce commission had power to direct an equalization of the rates, by which order the carriers were relieved from the obligation to maintain the intrastate rates fixed by the Texas authorities and could increase such rates to conform to the interstate rates fixed by the interstate commerce commission.

In *American Express Company* v. *State of North Dakota ex rel. Caldwell,* 244 U. S. 617, the intrastate express rates fixed by local authorities in South Dakota were lower than the interstate express rates fixed by the interstate commerce commission. Shippers located in Sioux City, Iowa, complained that they were prejudiced by this discrimination, in that it resulted to the advantage of competitors in certain cities in South Dakota with respect to certain competitive territory in the latter state. The interstate commerce commission made an order forbidding the express companies, which were interstate carriers, from charging higher rates between Sioux City and points in the competitive territory in South Dakota than they charged between the specified South Dakota cities and the same points. The express companies sought to put in force increased rates for intrastate traffic, to and from the said South Dakota cities, but the state authorities refused to approve such rates, and an action was commenced in the South Dakota courts by the attorney-general of that state to enjoin the companies from putting them in force without the sanction of the state authorities. On writ of error to the Supreme Court of South Dakota, the federal Supreme Court held that so far as the competitive territory was concerned the companies were by the order

of the interstate commerce commission authorized to increase their intrastate rates, but not outside of the competitive territory.

Finally, in *Illinois Central Railroad Co.* v. *State Public Utilities Commission of Illinois,* 245 U. S. 493, the question was whether an order of the interstate commerce commission directing an increase of intrastate rates on certain interstate railroads running between St. Louis, Missouri, and Keokuk, Iowa, on the one hand, and Chicago on the other, was valid. The court held that the order was too indefinite as to just what intrastate rates should be increased to be enforced, but the power of the interstate commerce commission to increase intrastate rates on interstate roads was reiterated. It was made to appear that the lower intrastate rates resulted in a discrimination as to competitive territory in Illinois in favor of Chicago, Hamilton and East St. Louis, in that state, and against Keokuk and St. Louis, in the states across the Mississippi. The railroads affected by that case appear to have been interstate roads, although that fact is not expressly stated.

The conclusion to be derived from these authorities is that if congress, or the interstate commerce commission under authority of congress, fixes rates for interstate carriers in any locality, and intrastate rates fixed by state authorities are different from the interstate rates, and the difference results in discrimination to the prejudice of individuals or localities, congress, or the interstate commerce commission acting under authority of congress, has power regardless of the action of the state authorities, to fix intrastate rates on the lines of such interstate carriers, so that such prejudicial discrimination shall be removed.

The present case involves a still further and more drastic assertion of power on the part of the federal

government. It now seeks to lay its hand on purely intrastate carriers and to exercise over their rates for intrastate transportation the same authority it has exercised over the intrastate rates of interstate carriers. If it shall succeed in establishing its right so to do, the last vestige of state authority over carriers' rates will be destroyed.

Coming now to the discussion of the three questions propounded above, I will take them up in inverse order. First, then, assuming that congress has such asserted power over the rates of intrastate carriers, and that it has invested the interstate commerce commission with authority to exercise that power, did the facts presented to the commission as a basis for its order of November 13, 1920, give it jurisdiction to make that order? A reading of the opinions delivered in the several decisions of the United States Supreme Court above referred to will make it evident that the evil aimed at was discrimination prejudicial to individuals or localities, and that in the absence of such discrimination the interstate commerce commission has no power to fix intrastate rates. Thus in *Houston & Texas Railway* v. *United States* (Shreveport case), *supra,* Mr. Justice Hughes said: " It is apparent from the legislative history of the act [Interstate Commerce Act] that the evil of discrimination was the principal thing aimed at, * * *" (p. 356).

And again: " It [Congress] did not undertake to authorize the Commission to prescribe intrastate rates and thus to establish a unified control by the exercise of the rate-making power over both descriptions of traffic. Undoubtedly — in the absence of a finding by the Commission of unjust discrimination — intrastate rates were left to be fixed by the carrier and subject to the authority of the States or of the agencies created by the States " (p. 357).

In that case, as already noted, the discrimination was against Shreveport and in favor of Houston and Dallas in competitive territory in Texas. In the *American Express Company Case, supra,* the discrimination was between shippers in an Iowa city and shippers in South Dakota with respect to competitive territory in the latter state. In the *Illinois Central Case, supra,* there was discrimination in favor of cities in Illinois against cities in adjoining states with respect to competitive territory in Illinois. These cases were of course based upon the Interstate Commerce Act as it existed prior to the amendment of section 13 by the Transportation Act of 1920. But these amendments, particularly the added paragraph numbered 4, above quoted, make it clear that discrimination is still the evil aimed at. It is provided in said paragraph that if the commission finds, upon investigation, " that any such rate, fare, charge, classification or practice [that is one ' made or imposed by the authority of any State,' paragraph (3)] causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce " the commission shall prescribe " the rate, fare or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation or practice, thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination." This means, I take it, that differences between intrastate and interstate rates shall not be permitted if they operate to the prejudice of individual travellers or shippers, or to the prejudice of competing cities or localities in the

territory served by a railroad, or to the prejudice of interstate commerce passing over any railroad. The Interstate Commerce Act still contains the provision that it shall not apply to transportation of passengers or property wholly within one state and not shipped to or from a foreign country. § 1, ¶ 2.

There is not a single fact appearing in the report of the interstate commerce commission on which the order of November 13, 1920, was based to show that as to either of the defendants in this action, the difference between intrastate and interstate rates results to the prejudice of any individual or of any city or locality competing with another city or locality in territory served by the defendants' roads, nor that interstate commerce over said roads in the four respects under consideration in this action is or will be in any wise hindered, diverted or subjected to unfavorable conditions not affecting intrastate commerce as well, nor that interstate commerce will be subjected to unreasonable or oppressive charges. The object sought to be accomplished by the order of July 29, 1920, was to raise rates to such an extent as to provide what the interstate commerce commission considered a proper revenue for the railroads, so as to permit a return of five and one-half per cent on the capital invested, after allowing for expenses and improvements, pursuant to paragraphs 2 and 3 of section 15a of the Interstate Commerce Act, as amended by the Transportation Act of 1920. The ground on which the commission acted in making the order of November 13, 1920, is well set forth in the dissenting report of Commissioner Eastman as follows: " In essence, the carriers' position is that when we authorize an increase in interstate rates under section 15 (a) of the interstate commerce act a corresponding increase must be made in intrastate rates; otherwise unjust

discrimination against interstate commerce results which it is our duty under section 13 to correct. State commissions may be asked to authorize the intrastate increases, but they need be offered no evidence except the fact of our decision and have no real discretion. The carriers accept the logical consequence of this view, if I understand them correctly, by holding that applications to the state commissions are in substance a matter of courtesy and that we could, under section 13, either upon complaint or upon our own motion, prescribe the intrastate rates desired even if no such applications had been made. If this be so, it follows that we could practically at will deprive any or all of the states of authority over intrastate rates, for when such rates are once prescribed by our order under section 13 they can not thereafter be changed without our consent."

The purpose and object of the commission seems to have been not to prevent discrimination against individuals or localities or against interstate commerce passing over New York railroads, but to compel intrastate traffic in New York, whether over interstate or intrastate lines, to bear what the commission considered its fair share of the cost of railroad traffic and of a fair return on the capital invested, taking all the railroads, interstate and intrastate, as a whole. This is made evident by the following excerpts from the majority report:

" In accordance with these statutory provisions we designated four rate groups, one of which embraces the territory bounded on the west by the Mississippi River and on the south by the Ohio River and the main line of the Norfolk & Western Railway; and we authorized increased rates, fares, and charges that were designed to enable the carriers as a whole in that rate group, ' under honest, efficient, and economical man-

agement and reasonable expenditures for maintenance of way, structures, and equipment,' to earn an aggregate annual net railway operating income equal, as nearly as may be, to 5½ per cent upon the aggregate value of the railway property of such carriers in that group, plus one-half of 1 per cent of that aggregate value for improvements, betterments, or equipment, chargeable to capital account.

" Congress has taken, as the basis for determining a fair return for the railroads, the aggregate value of the railway properties in each group held for and used in the service of transportation. In making a tentative finding of the value of the railway properties in each group, for the purposes of our report, we included all the railway property of each carrier held for and used in the service of transportation. This should not be construed as holding that jurisdiction over intrastate rates and fares has been taken away from the states and reposed in us. We find nothing in the law to indicate that such was the intent of Congress. But Congress has directed that we allow rates that will yield in the aggregate a return of 5½ or 6 per cent upon the value of the railway property in each of the groups. There can be no doubt of the power of Congress to devise and provide for carrying into effect a plan for assuring to the nation's interstate railroads a fair return upon the value of their property; and the full control by Congress of this matter is not to be denied on the ground that the carriers' aggregate earnings are a commingling of intrastate revenue and interstate revenue. * * *

" The record shows that the refusal of the state of New York to permit the carriers to increase the rates and fares here in controversy to the extent approved by us is costing the railroads between $11,000,000 and $12,000,000 annually. In other words, the annual

46

earnings of the interstate carriers operating in New York are now between $11,000,000 and $12,000,000 less than they would be if the general level of rates and fares approved by us had become effective on intrastate traffic; and to that extent the declared purpose of Congress is defeated by a preferential basis of rates and fares maintained by authority of the State of New York.''

In other words, these excerpts, together with the order of the commission requiring increases of rates by intrastate carriers on intrastate transportation to correspond with the interstate rates fixed by the commission, means that the commission is attempting to establish a '' unified control '' over all the railroads of the country, interstate and intrastate, such as it was said in the Shreveport case (*Houston & Texas Railway* v. *United States*), *supra*, congress did not intend to authorize. It is true that discrimination is found in the report in general terms, and in the instance of one railroad, the New York Central, facts are set forth in support of such findings. But, as already stated, no such facts appear so far as the defendants in this action are concerned.

Nor do any facts appear in the opposing papers which show undue discrimination against interstate commerce, or between individuals or localities in interstate commerce on the one hand and intrastate commerce on the other. The passengers who travel on through tickets over the Long Island railroad to or from points outside of New York state are not shown to be sufficient in number to justify that intrastate carrier in setting at naught the commands of the state authorities. So far as such passengers are concerned, they can prevent any discrimination at all by breaking their journey in New York city. As to the Staten Island Company, the relatively few who use the ferry in connection with the railroad can likewise

avoid all discrimination by buying ferry tickets sep-
arately. Since the trains and boats do not connect
this will not prove a hardship. Persons travelling in
parlor cars on the Long Island railroad will not be
affected, for it is not shown that the railroad carries
any through parlor cars, nor that there are through
parlor car tickets or rates in connection with parlor
cars operated on other roads running to points outside ·
of New York state.

From all this the conclusion follows that the inter-
state commerce commission, even assuming that con-
gress has lawfully authorized it to fix intrastate rates
on intrastate railroads to prevent discrimination, has
exceeded its authority, and that facts did not exist
which under the Interstate Commerce Act justified
the exercise of such power.

The second question hereinbefore stated is whether
congress, by its amendment of section 13 of the Inter-
state Commerce Act by the Transportation Act of
1920, intended to vest in the interstate commerce
commission authority to regulate intrastate rates on
intrastate railroads, in case such rates should be
found unduly discriminatory as respects interstate
commerce. Section 1 of the Interstate Commerce Act,
as amended by the Transportation Act of 1920, pro-
vides in part as follows:

"(1) That the provisions of this Act shall apply to
common carriers engaged in —

"(a) The transportation of passengers or prop-
erty wholly by railroad, or partly by railroad and
partly by water when both are used under a common
control, management, or arrangement for a con-
tinuous carriage or shipment. * * *

"(2) The provisions of this Act shall also apply to
such transportation of passengers and property
* * * but only in so far as such transporta-

tion * * * takes place within the United States, but shall not apply —

" (a) To the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one State and not shipped to or from a foreign country from or to any place in the United States as aforesaid."

It has been held that carriers operating wholly within the limits of one state become, if they engage in carrying merchandise consigned from a point in one state to a point in another, instruments of interstate commerce and so are subject to federal regu ⁀ations so far as concerns the interstate commerce in ẅnich ⁀⁀⁀ẏ thus engage. *The Daniel Ball,* 10 Wall. 557; *Norfo...i & Western R. R. Co.* v. *Pennsylvania,* 136 U. S. 114; *Cin., N. O. & Tex. Pac. Ry. Co.* v. *Interstate Commerce Commission,* 162 id. 184. But that is far from holding that as to their purely intrastate business, where that can be separated from interstate business, such carriers are subject to federal control. In the case of the defendants here there is no difficulty, so far as passenger traffic and transportation of milk and cream are concerned, in separating intrastate from interstate business.

In view of the provision above quoted excluding intrastate transportation from the operation of the Interstate Commerce Act, I think it would be indulging in too violent a presumption to hold that congress intended, by the two paragraphs added to section 13, to authorize the interstate commerce commission to fix intrastate rates on intrastate roads, even if it should find such rates discriminating as regards interstate commerce and persons or localities engaged therein.

This brings me finally to the discussion of the first and most important of the three questions, namely, as to the power of congress to regulate or fix, either

directly or through the interstate commerce commission, intrastate rates on intrastate roads. To grant that congress has this power is to enable the federal government to take away, as already stated, all the authority of the states over the railroad lines within their limits, for what railroad can be found which does not at times engage in the transportation of persons or goods in interstate commerce?

This is a subject of far greater import than the question whether railroads should or should not be permitted to increase their rates of fare. It involves the question of the sovereignty of the states. It is a fundamental question upon which the whole fabric of our government rests. As such, it should never be lost sight of by the people and certainly not by courts. I shall, therefore, claim the privilege here and now of calling attention, though the effort may be futile, to a few of the underlying principles upon which this republic was founded and upon which this sovereignty depends. I may say, at the outset, that, by the Constitution of the United States, article VI, it is provided that " This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

This provision very plainly states that it is not the laws of the United States but the laws of the United States *which shall be made in pursuance of the Constitution,* that bind the judges in every state. Hence, it is clear that the judges in the several states have the right to inquire whether any law of the United States is or is not a constitutional exercise of the law-making power; and to pass upon that question, subject to

Supreme Court, December, 1920.    [Vol. 113.

review of their decisions by the Supreme Court of the United States, whose power extends to all cases in law or equity, arising under the Constitution. The Constitution was adopted at a convention, composed of the deputies from twelve of the original states, on September 17, 1787, and, at the same convention, a desire was expressed by the representatives of a number of the states adopting the Constitution, " in order to prevent misconstruction or abuse of its powers, that further declaratory and restrictive clauses should be added, and, as extending the ground of public confidence in the government, will best insure the beneficent ends of its institution."

Accordingly, ten articles of amendment were adopted at the first session of the first congress, held on March 4, 1789. It was said in *Spies* v. *Illinois,* 123 U. S. 131, 166: " That the first ten articles of amendment were not intended to limit the powers of the state governments in respect to their own people, but to operate on the National Government alone, was decided more than a half century ago, and that decision has been steadily adhered to since."

Article X of these amendments reads as follows: " The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Article IX provides that " The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

If the original form of our government had been other than it was, the need of these provisions would not have arisen. If only one great state had been formed by the amalgamation of the thirteen original states, when they found that the Articles of Confederation which had bound them in their struggle for independence were too loose and inadequate to the uses

Misc.]          Supreme Court, December, 1920.

and protection of a nation composed of sovereign states, perhaps the machinery of government might have been simplified, but such a plan could not have been adopted. Every one who is familiar with the history of our government knows that the Constitution was not adopted without controversy, doubt, jealousy and suspicion on the part of many people in the different states. So much opposition was, indeed, shown to the proposition of the new Federal Constitution in our own state that two of our deputies, Lansing and Yates, withdrew from the convention, leaving Alexander Hamilton alone to represent this state in the convention, and later the opposition almost defeated the ratification by New York, it only being adopted by a majority of three votes out of a total of fifty-seven in the state convention on ratification.

Under this Constitution, the powers of government over all the states were vested in the general or federal government; and, at the same time, the powers of government over each state, in so far as they were not delegated either expressly or by necessary implication to the federal government were reserved to the states themselves. In a word there was thus created a nation comprising in one union a central state and as many separate states as then existed or have been created since. The result of this dual form of government is that each citizen of the country owes a double allegiance, first to the federal government and then to the government of the state where he resides. This dual government, or *imperium in imperio,* claiming double allegiance, although its detractors have spoken of it as an anomaly, is not logically incompatible, although at times it has frequently presented complex questions of control. In the working out of this hitherto untried form or theory of government during the past century and a third that have elapsed since its adoption, efforts have been made on the one hand

to increase the federal power and on the other to strengthen the power of the states. These attempts have never succeeded to any extent that threatened the fabric of our government. But, in the last few years, owing, perhaps, to the influx into our land of vast numbers of aliens without knowledge of or interest in our institutions; or owing to a dangerous tendency on the part of our higher officials to disregard constitutional limitations upon autocratic power; or owing to a growing indifference on their part to the constitutional balancing of power between the executive and legislative branches of our government; or owing to unusual conditions of administration resulting from the World War, or to other influences, some of which might easily be suggested, there seems now to be a danger that state sovereignty will be forgotten or lost in an enlarged but unconstitutional expansion of federal control and power over matters which are clearly within the limits of state jurisdiction. If such a condition shall ever be brought about, our entire system of constitutional government will be at an end, and, upon the ruins of our states there will arise a centralized power which must inevitably merge either into absolutism on the one hand or into anarchy on the other, and the magnificent example and spectacle of a government of the people, by the people and for the people will perish from the earth.

To return, therefore, to the question which has been suggested whether the congress has the right to confer upon an administrative and not upon the judicial branch of the federal government, power to control rates of fare of transportation companies operating within the state which has given it a charter, I believe that the question must be answered in the negative. Otherwise, what becomes of state sovereignty? If the congress can control intrastate railroad rates, why may

it not also control and regulate rates to be charged for all public utilities or public commodities or by all corporations or individuals engaged in business which affects public interests, through the fiction that it affects interstate commerce — such for example as coal, petroleum, gas, electric light, the telegraph and telephone? If it can regulate the price of those commodities, why may it not regulate the price of the labor which produces them or the various trades or manufactures which make use of them? Can it, in other words, regulate and control every kind of business, corporate or private, carried on in each of the states? If the general government can by means of congressional or executive agencies regulate and control all commerce, both interstate and intrastate, must it stop there? Can it regulate all the relations of life, including those of husband and wife, parent and child, master and servant, landlord and tenant, by making general laws superseding the statutes of the several states? Where shall the line be drawn, or is there no line? In times of war doubtless it may do many of those things which would be extra constitutional in times of peace. Is the constitution a vital force for the conservation of the general good, or is it a discarded relic of other days in our republic, when law was not a purchasable commodity, either in legislative halls or in the courts of justice?

It is to be hoped that these questions, so vital to the welfare of our people, so serious in their consequences to our national existence, so threatening in their portent to our states, may not be allowed to go unanswered by those who, under our constitution, are charged with the high duty and privilege of representing the people of this nation in their executive and legislative departments.

Nearly 100 years ago, Governor DeWitt Clinton, in

Supreme Court, December, 1920. [Vol. 113.

an annual message to the legislature, speaking of an attempt on the part of the federal government to require boats navigating the canals within the state to be enrolled and licensed and to pay tonnage duties under the statutes regulating the coasting trade of the United States, spoke as follows: " The considerations which grow out of this occasion, and the complaints which have been made in different states about alleged encroachments of the national government on their constitutional powers, point to the most formidable dangers that can menace the stability of the union and the welfare .of our country. Without a general government, we shall neither have union at home nor respect abroad. We shall be arrayed into separate confederacies, or exist as insulated states, maintaining large standing armies, wasting our resources in intestine wars, the dupes of foreign intrigue and the victims of civil discord. Without state authorities, there can be no civil liberty and no good government; for it is utterly impossible that so extensive a country can be bound together unless as a confederation or a military despotism. Every true friend of America will strive to maintain these respective authorities in full purity and vigor, without detracting from the powers of the one to add to those of the other, nor extending the faculties of either beyond their legitimate dimensions. Each possesses a portion of the delegated authority of the people, and each is supreme within the sphere of its constitutional powers. The apprehensions entertained by some of our distinguished statesmen at the formation of the national constitution have entirely failed; and instead of the predominance of a controlling power in the states, the centripetal force of the general government has had perhaps too great a preponderance." See *Messages of the Governors,* Vol. III, p. 78.

If anything were needed to add to the force of this statement, it may be found in the noteworthy address of United States Senator Charles S. Thomas, of Colorado, delivered before the State Bar Association of New York on January 16, 1920, and published in its annual report, at page 391 *et seq.*

It would be presumptuous in me to attempt any elaborate defense of our institutions. Abler pens than mine have dealt with the subject in language that will forever perpetuate the motives, the ideals and the sacrifices of the men who founded this republic. Perhaps I ought humbly to confine my words to the interpretation of law, as Lord Bacon wrote that judges should, but in what I have been saying, my purpose was not otherwise than to call attention to the dangers that lie in the pathway in which we seem to be traveling, a pathway which must lead to an end where our union, our justice, our domestic tranquility and the blessings of liberty that the Constitution endeavored to perpetuate will be no more and where the words " The *United States* of America " will have lost their true significance.

Motion for injunction *pendente lite* is granted with ten dollars costs to the plaintiff.

Motion granted, with ten dollars costs to plaintiff.